UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                          )
IN THE MATTER OF THE                      )
EXTRADITION OF                            )    Docket No: 1:13-mj-07043-JCB
ALEXANDER HILTON                          )
_____ )

### ALEXANDER HILTON'S MEMORANDUM OF LAW IN OPPOSITION TO EXTRADITION TO SCOTLAND

Alexander Hilton should not be extradited to Scotland. As set forth below, this Court should not certify Mr. Hilton as extraditable under 18 U.S.C. § 3184 because Mr. Hilton's extradition to Scotland would be in violation of the extradition treaty between the United States and the United Kingdom as advised and consented to by United States Senate and ratified by the United States and his rights under the United States Constitution. Further, extradition should be denied because extradition creates the real and substantial risk that Mr. Hilton, who has a long and well-documented history of mental illness and severe psychological impairments, will commit suicide and, thus, a decision to extradite him is incompatible with his constitutional and human rights.

### ARGUMENT

**A. The Court Must Deny Mr. Hilton's Extradition Because His Extradition to Scotland Would Be in Violation of the United States-United Kingdom Extradition Treaty as Advised and Consented to by the United States Senate and Ratified by the United States and His Constitutional Rights**

In giving its advice and consent to the ratification of the extradition treaty with the United Kingdom, the Senate did so subject to specific understandings, declarations and provisos. (Ex. A, S. Exec. Rep. No. 109-19, *Extradition Treaty between the United States of America and the United Kingdom of Great Britain and Northern* Ireland, 109th Cong., 2d Sess. 8 (2006)). One of those declarations provides:

1

Resolved (two-thirds of the Senators present concurring therein),

SECTION 1. SENATE ADVICE AND CONSENT SUBJECT TO UNDERSTANDING, DECLARATIONS, AND PROVISOS

The Senate advises and consents to the ratification of the Extradition Treaty between the United States of America and the United Kingdom of Great Britain and Northern Ireland, and related exchanges of letters, signed at Washington on March 31, 2003 (hereinafter in this resolution referred to as the ``Treaty'') (Treaty Doc. 108-23), **subject to** the understanding in section 2, the declarations in section 3, and the provisos in section 4. [emphasis added]

***

SECTION 3. DECLARATIONS

The advice and consent of the Senate under section 1 is subject to the following declarations:

(1) Nothing in the Treaty requires or authorizes legislation or other action by the United States of America that is prohibited by the Constitution of the United States.

(2) The Treaty shall be implemented by the United States in accordance with the Constitution of the United States and relevant federal law, including the requirement of a judicial determination of extraditability that is set forth in Title 18 of the United States Code.

This Declaration is binding on the government, and specifically requires it to implement the treaty "in accordance with the Constitution" and to not take any "other action . . . that is prohibited by the Constitution".[1]

---

[1] Even in the absence of the above declaration,

> [i]t is well-settled, however, that the United States government must, in carrying out its treaty obligations, conform its conduct to the requirements of the Constitution, and that treaty obligations cannot justify otherwise unconstitutional governmental conduct. *See Reid v. Covert,* 354 U.S. 1, 16-19 (1957) (plurality opinion); *In re Aircrash,* 684 F.2d 1301, 1308-09 (9th Cir. 1982); *Chas. T. Main Int'l, Inc. v. Khuzestan Water & Power Auth.,* 651 F.2d 800, 813 n.20 (1st Cir. 1981); *Rosado v. Civiletti,* 621 F.2d 1179, 1195-96 (2d Cir.), *cert. denied,* 449 U.S. 856 (1980); *Edwards v. Carter,* 580 F.2d 1055, 1058 (D.C. Cir.), *cert. denied,* 436 U.S. 907 (1978); *Holmes v. Laird,* 459 F.2d 1211, 1217 (D.C. Cir.) (specifically holding that the United States

In this case, if Mr. Hilton is extradited to Scotland, he would be tried by a jury of 15 jurors. However, the Scottish law of criminal procedure requires only a simple majority of the jurors to convict him. Thus, even if seven of the jurors believe he is not guilty, he can be convicted by the votes of the other eight jurors. (*See* Ex. B, The Modern Scottish Jury in Criminal Trials, Chapter 7, http://www.Scotland.gov.uk/Publications/2008/09/17121921/0 (last accessed March 4, 2013).)

In 1972, a sharply divided Supreme Court upheld, against Due Process challenges, convictions in Louisiana and Oregon by 9-3 and 10-2 jury verdicts respectively. *Johnson v. Louisiana*, 406 U.S. 356 (1972); *Apodaca v. Oregon*, 406 U.S. 404 (1972). Subsequently, a unanimous Supreme Court struck down a conviction by a 5-1 majority of a six person jury stating that "it is inevitable that lines must be drawn somewhere if the substance of the jury trial right is to be preserved", such a conviction "presents a…threat to preservation of the substance of the jury trial guarantee and justifies our requiring verdicts rendered by six-person juries to be unanimous." *Burch v. Louisiana*, 441 U.S. 130 (1979). Plainly, conviction by a simple majority of a larger jury presents an even greater threat to Mr. Hilton's due process rights and the fairness of the trial he would face in Scotland.

---

Constitution overrides the SOFA Treaty and the USA-FRG Supplementary Agreement), *cert. denied,* 409 U.S. 869 (1972); *Bell v. Clark,* 437 F.2d 200, 203 (4th Cir. 1971) (testing treaty against Constitution).

\* \* \*

Although the power and the discretion of the Executive is undoubtedly great in matters of foreign relations, the cases to which we have referred demonstrate that the exercise of this power is limited by the provisions of the federal constitution. And, unquestionably, it is the province of the judiciary to adjudicate claims that governmental conduct is in violation of the Constitution. *See Marbury v. Madison,* 5 U.S. (1 Cranch) 137 (1803). Thus, although the Secretary of State and the President have the discretion *not* to extradite an individual for any reason whatsoever, including, for instance, a concern as to deficiencies in the judicial process in the requesting country, *see Eain v. Wilkes,* 641 F.2d 504, 508 (7th Cir.), *cert. denied,* 454 U.S. 894 (1981); *Collier v. Vaccaro,* 51 F.2d 17, 20 (4th Cir.1931), they may not choose to extradite an individual where such extradition would, in the opinion of the judiciary, violate the individual's constitutional rights.

*Plaster v. United States,* 720 F.2d 340, 348-49 (4th Cir. 1983). *Accord In re Extradition of Burt,* 737 F.2d 1477, 1483-85 (7th Cir. 1984).

The general rule in United States extradition law, the so-called Rule of Non-Inquiry, is that the courts "are bound by the existence of an extradition treaty to assume that the trial [in the requesting country] will be fair." *Glucksman v. Henkel*, 221 U.S. 508, 512 (1911). This rule effectively places responsibility on the Executive Branch – the very branch of the government that is representing Scotland's extradition request before this court[2] – to determine whether the surrender of the requested person in a specific case might lead to a significant deprivation of the rights of the requested person in the requesting country.

Courts have expressed some uneasiness with this rule. The Court of Appeals for the Second Circuit "confessed" to some "disquiet" with this rule stating, "We can imagine situations where the relator [requested person], upon extradition would be subject to procedures or punishment so antipathetic to a federal court's sense of decency as to require reexamination of the principle…." *Galina v. Fraser*, 278 F.2d 77, 79 (2d Cir.), *cert. denied*, 364 U.S. 851 (1960); *accord In re Burt* 737 F.2d 1477, 1487 (7th Cir. 1984). Extradition to Scotland pursuant to the United States-United Kingdom treaty would subject Mr. Hilton to a procedure not only plainly antipathetic to a federal court's sense of decency, but also a violation of his constitutional Due Process rights – conviction by a simple majority of eight of 15 jurors.

There is no indication in *Glucksman* that the requested person attempted to draw into question whether the Senate considered the fairness of the requesting country's criminal procedure before giving its advice and consent to the ratification of the treaty in question. In this case, however, it is crystal clear that the Senate, in giving its advice and consent to the ratification of the Treaty on Extradition between the United States and the United Kingdom, "Subject to Understanding, Declarations and Provisos," did so totally unaware that someone

---

[2] It is submitted that such representation of a requesting country's extradition request before the judiciary constitutes a clear conflict of interest within the government.

4

extradited from the United States to Scotland could be convicted by a simple majority of jurors – a concept completely alien to American Constitutional concepts of trial by jury, due process and fairness.

In this regard, the treaty document by which the President transmitted the treaty to the Senate seeking its advice and consent to ratification makes no mention of the Scottish laws relating to criminal verdicts.  (Ex. C, S. Treaty Doc. No. 108-23, *Extradition Treaty with Great Britain and Northern Ireland,* 108th Cong., 2d Sess. (2004)).  Moreover, despite two lengthy hearings before the Senate Committee on Foreign Relations, there was no mention of the Scottish laws relating to criminal verdicts.  (Ex. D, S. Hrg. No. 109-342, T*reaties*, 109th Cong., 1st Sess. (2005); Ex. E, S. Hrg. No. 109-570, *Treaty*, 109th Cong., 2d Sess. (2006).)[3]  Likewise, the Foreign Relations Committee's report, recommending that the full Senate give its advice and consent to the treaty's ratification, does not mention of the unique Scottish laws relating to criminal verdicts.  (Ex. A, S. Exec. Rep. No. 109-19, *Extradition Treaty between the United States of America and the United Kingdom of Great Britain and Northern* Ireland, 109th Cong., 2d Sess. (2006).)  Thus, despite the constitutionally antipathetic Scottish jury verdict laws, neither the Department of State nor the Department of Justice apparently ever brought them to the attention of the Senate Committee on Foreign Relations, and that Committee was not cognizant of them when it recommended that the Senate give its advice and consent to ratification.

In this regard, it is quite possible that the State Department and Justice Department negotiators themselves were not aware of the differences between the jury verdict laws of Scotland and Great Britain, Wales and Northern Ireland.   With respect to those constituent parts

---

[3] The only discussion of the fairness of the criminal procedures in the United Kingdom in the hearings relates to infamous Diplock Courts in Northern Ireland for the trial of alleged IRA terrorists.  (*See* Ex. E, S. Hrg. No. 109-570, *Treaty*, 109th Cong., 2d Sess. 56-57, 74-75 (2006).)

of the United Kingdom, the United Kingdom's Juries Act 1974, Ch. 23, Sec. 17, which is not applicable to Scotland, provides:

> **17      Majority verdicts.**
>
> (1) Subject to subsections (3) and (4) below, the verdict of a jury in proceedings in the Crown Court or the High Court need not be unanimous if—
>
> (a) in a case where there are not less than eleven jurors, ten of them agree on the verdict; and
>
> (b) in a case where there are ten jurors, nine of them agree on the verdict.
>
> \*\*\*
>
> (3) The Crown Court shall not accept a verdict of guilty by virtue of subsection (1) above unless the foreman of the jury has stated in open court the number of jurors who respectively agreed to and dissented from the verdict.

(Ex. F, United Kingdom's Juries Act 1974, Ch. 23, Sec. 17.)  Consequently, the United Kingdom's majority jury verdict statute is consistent with the constitutional norms expressed in the Supreme Court's opinions in *Johnson, Apodaca* and *Burch*.  However, if the Department of State and Department of Justice negotiators were aware of the differences between the jury verdict laws of Scotland and the rest of the United Kingdom, they were derelict in not bringing them to the attention of the Senate.

The bottom line is that the Senate was not made aware that Scotland's jury verdict laws plainly failed to meet United States constitutional standards when it gave its advice and consent to the ratification of the treaty pursuant to which Mr. Hilton's extradition has been requested. Moreover, in view of the grave concerns expressed in the Senate hearings with the fairness of prosecutions in Northern Ireland's Diplock Courts,[4] it is submitted that had the Senate been so informed, it would have included a specific reservation, declaration or understanding in its advice and consent to the ratification barring extradition to Scotland for trial by a simple

---

[4] *See supra* n.3.

majority jury.[5]

For the above reasons, it is submitted that Mr. Hilton's extradition to Scotland would violate his constitutional rights and is prohibited by the terms of the treaty as ratified and the Constitution.

### B. Mr. Hilton Should Not Be Extradited Because He Has Severe Psychological Impairments Which Lead to the Real Risk that He Will Commit Suicide If Extradited

Mr. Hilton should also be entitled to a humanitarian exception to extradition. While the government states in its brief that denial of extradition on humanitarian grounds is at the "sole discretion" of the Secretary of State (Doc. 12 at 21), Mr. Hilton's case does not involve a challenge to procedures or treatment awaiting him in Scotland, but instead involves his longstanding and severe psychiatric condition and the substantial and real risk that he will end

---

[5] Scotland's simple majority verdict – a concurrence of a mere 53 1/3 percent of the jurors – raises significant due process concerns, particularly because Scotland also permits hearsay statements of dead or unavailable witnesses to be presented before the jury that would not be admissible in American courts. Section 259 of the Criminal Justice Act of Scotland provides that a statement taken from a witness who subsequently dies or is outside the United Kingdom, where it is not reasonably practicable to secure his or her attendance or otherwise obtain his testimony in a competent matter, may be admissible as an exception to the hearsay rule even where the defendant had no prior opportunity to cross-examine the witness. (*See* Ex. G, Criminal Justice Act of Scotland § 259.) Scottish law is in direct contradiction with the Sixth Amendment of the United States Constitution, which guarantees the accused in all criminal prosecutions the right to confront the witnesses against him. The Supreme Court has held that the accused's right to confrontation requires that testimonial evidence, including a prior statement, is inadmissible unless the witness appears at trial or, if the witness is deceased or otherwise unavailable, if the defendant had a prior opportunity to cross-examine the witness. *See Crawford v. Washington*, 541 U.S. 36, 61-62 (2003) (explaining that "[the confrontation clause] commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination").

    In the instant case, the lack of confrontation rights in Scotland is particularly troubling because at least one witness from whom Scottish authorities took a statement, John Shipley, died in June 2012 due to unrelated circumstances. (*See* Ex. H, News Article re: Shipley's Death.) As indicated in the Extradition Request, Shipley was a percipient witness who was present in the room with Hilton and Forbes when Forbes allegedly consumed tainted wine. (*See* Doc. No. 3-2, Extradition Request ¶ 2.9.) Moreover, many of the witnesses involved in this case are international students who will likely graduate from St. Andrews, leave Scotland, and return to their native countries by the time a trial happens in this case should Hilton be extradited. As a result, Scottish authorities may have difficulty securing these witnesses' attendance and, thus, pursuant to Scottish law, may use their prior statements instead. Thus, should he be extradited to Scotland, Hilton would have no right to confrontation with respect to multiple witnesses against him. The use of these untested witness statements, coupled with the simple majority verdict, lay bare that a trial in Scotland raises serious due process issues that are so antipathetic to an American court's sense of decency that a federal court's review of these practices is necessary before allowing extradition of an American citizen. *See Crawford*, 541 U.S. at 62 ("Dispensing with confrontation because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty. This is not what the Sixth Amendment prescribes.").

his life should he be extradited to Scotland. Simply put, extradition to Scotland will be a death sentence for Mr. Hilton in violation of his fundamental constitutional and human rights.

Dr. Judith Edersheim, a highly reputed forensic psychiatrist, has conducted a comprehensive evaluation of Mr. Hilton, which included seven hours of interviews with him, interviews of his parents, and an exhaustive review of his school and mental health records. (*See* Ex. I, Affidavit of Dr. Judith Edersheim & CV.) In her affidavit, Dr. Edersheim describes Mr. Hilton as an individual with a long history of mental illness, presenting from childhood, and severe psychological deficits that globally impair his functioning. (*See id.* ¶ 4.) Dr. Edersheim opines that Mr. Hilton may have Asperger's Disorder which went undiagnosed as a child, and currently suffers from substance abuse disorder and serious mental illness with diagnostic considerations pointing to Schizophrenia, Delusional Disorder, or generalized Psychotic Disorder. (*Id.* ¶¶ 4-5.)

According to Dr. Edersheim, extraditing Mr. Hilton to Scotland "would disrupt current measures taken to monitor Mr. Hilton's suicidality and would disrupt treatment for his acute mental illness. Disruption of his treatment in the context of increasing stress is likely to increase the risk of self-harm." (Ex. I, Edersheim Aff. ¶ 7.) Dr. Edersheim bases her opinion on her findings that Mr. Hilton has chronic difficulty coping with the mild to moderate stressors that accompany the transitions of everyday adult life" and explained that, when faced with emotional stressors, including developments in his legal case, Mr. Hilton "decompensates acutely," which results in the "acceleration of psychiatric symptoms requiring mental health treatment." (*Id.* ¶ 6.a; 7.a.) Because Mr. Hilton is socially isolated and "[a]ll his daily structure and care are provided by his mother and father and they are his only emotional resource," Dr. Edersheim concludes that extradition to Scotland will "disrupt[] his ability to obtain daily support from his

parents [and] will undermine his tenuous mental stability." (*Id.* ¶ 7.a.) Further, Dr. Sommer, Mr. Hilton's treating psychologist who had seen him twice weekly prior to his detention, believes that Mr. Hilton is has expressed suicidal thoughts and "could engage in impulsive self-harm" and also believes that discontinuation of their treatment, which would necessarily result should Mr. Hilton be extradited, "would have an adverse affect on Mr. Hilton's mental status, as he has few internal resources to summon in times of distress." (*Id.* ¶ 7.b.)

In fact, Dr. Edersheim notes that while Mr. Hilton was at St. Andrews, where he was separated from his family and psychiatric support, he was "immediately overwhelmed" and described as "disinhibited, erratic, disorganized, and unmotivated." (*See* Ex. I, Edersheim Aff. ¶ 5.d.) According to Dr. Edersheim, "[d]uring his three terms at St. Andrews, he articulated paranoid, peculiar, grandiose, and delusional ideas, and spoke frequently about plots to harm him and implausible international conspiracies." (*Id.*) As a result of the stressors he faced at St. Andrews, Mr. Hilton engaged in self-injurious behavior, including cutting and burning himself. (*Id.* ¶ 5.e.)

Following his time at St. Andrews, Mr. Hilton has continued to be at high risk for self-injurious or self-destructive behavior based on his expression of suicidal thoughts and plans to his therapist and parents. (*See* Ex. I, Edersheim Aff. ¶¶ 5.j & 6.c.) He recently received emergency psychiatric evaluations as a result of this behavior and has since attended a partial hospital program on two occasions, which discharged him pursuant to the recommendation that he take psychiatric medications and obtain ongoing treatment and therapy. (*Id.* ¶¶ 5.j & 7.c.) Pursuant to this recommendation, Mr. Hilton was placed on medications for depression and anxiety and, prior to being detained, had sees his psychotherapist Dr. Sommer two times per week and had voluntarily seen him with increasing urgency in order to assess him due to his

suicidal thoughts.  (*Id.* ¶¶ 7.b-c.)  According to Dr. Edersheim, "Mr. Hilton was mentally stable while residing at home with his parents.  While he did experience transient suicidal ideas, he was able to communicate these to his parents and psychotherapist, and voluntarily sought a high level of mental health treatment under these circumstances."  (Ex. J, Supplemental Affidavit of Dr. Judith Edersheim ¶ 2.a.)

However, as soon as Mr. Hilton was detained by federal authorities and was removed from the support of his parents and psychotherapist, his mental status deteriorated substantially and he became actively suicidal.  (Ex. J, Supplemental Affidavit of Dr. Judith Edersheim ¶ 2.c.)  He made attempts to puncture his neck and wrist and was put on suicide watch for approximately 11 days.  (*Id.*)  He was only stabilized and taken off suicide watch after he was able to meet with Dr. Sommer pursuant to this Court's order.  Afterwards, he was moved from the medical unit to protective custody.  According to Dr. Sommer, Mr. Hilton's mental condition has worsened since he has been detained:  Mr. Hilton for the first time began suffering from overt psychotic thoughts, including auditory, visual, and tactile hallucinations, and is suffering from feelings of hopelessness and suicidal thoughts.  (*Id.* ¶ 2.d.)

Mr. Hilton's precarious psychological condition, including the significant risk that his mental state will deteriorate to the extent that his safety will be at risk if he is extradited, requires denial of extradition in this case.  Given the importance of reciprocity in extradition cases, it is worthwhile to examine the McKinnon case, in which the United States sought extradition of a British citizen on charges of infiltrating U.S. military computers.  (*See* Ex. K, Statement of Home Secretary on Extradition of McKinnon.)  Mr. McKinnon, who was diagnosed with Asperger's and depression, has a mental health condition is similar to Mr. Hilton's or arguably even less severe than his, but the charges against Mr. McKinnon were serious and directly impacted U.S.

national security. The U.K. Home Secretary ultimately denied the United States' extradition request in its entirety based on her conclusion that "Mr. McKinnon's extradition would give rise to such a high risk of him ending his life that a decision to extradite would be incompatible with Mr. McKinnon's human rights." (*See id*.) Mr. Hilton's circumstances are no different and, in fact, his personal history and current psychological state demonstrate a high risk of suicide should he be extradited. Just as with the McKinnon case, extradition of Mr. Hilton should be denied because it would give rise to such a high risk that he will end his life that a decision to extradite him would be incompatible with his fundamental due process rights.

Should the Court decline to consider Mr. Hilton's humanitarian claim, it should allow Mr. Hilton to present evidence of his long-standing and severe psychiatric condition, which is a factor the Secretary of State may consider in denying extradition. *See Peroff v. Hylton*, 563 F.2d 1099 (4th Cir. 1977) (recognizing that "denial of extradition by the Executive may be appropriate when strong humanitarian grounds are present"). Under 18 U.S.C. § 3184, it is the responsibility of the Court to conduct the extradition hearing and, if the relator is certified for extradition, to present the testimony to be considered by the Secretary of State in the final extradition determination. The Secretary ordinarily relies solely on the record upon which the certification of extraditability is made in determining whether to order the surrender of the requested person. Accordingly, it is critical that the evidence of Mr. Hilton's mental state be presented at his extradition hearing. Given that the Secretary of State can and should consider Mr. Hilton's psychiatric condition as a basis for denying extradition, Mr. Hilton submits that due process requires that he be permitted to present this evidence at the extradition hearing.

## CONCLUSION

In sum, extradition of Mr. Hilton would violate the United States-United Kingdom treaty and his constitutional rights. Further, given his precarious psychological state and high risk of suicide, extradition should be denied on humanitarian grounds.

Mr. Hilton understands from the government that it may file a reply to this brief and requests leave to file further briefing following the March 7, 2013 hearing on this matter.

Dated: March 4, 2013                    Respectfully submitted,
                                        ALEXANDER HILTON
                                        By his attorneys,

                                        /s/ Norman Zalkind
                                        Norman Zalkind
                                        Monica R. Shah
                                        Zalkind Duncan & Bernstein LLP
                                        65a Atlantic Avenue
                                        Boston, MA 02110
                                        (617) 742-6020

## CERTIFICATE OF SERVICE

I hereby certify that on March 4, 2013, I electronically filed the foregoing and attached exhibits with the Clerk of the Court for the United States District Court for the District of Massachusetts by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

                                        /s/ Monica R. Shah
                                        Monica R. Shah